**AFFIRMED; Opinion Filed April 17, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-18-00583-CR
No. 05-18-00584-CR

**ROBERT EARL NASH, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 204th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause Nos. F17-41188-Q & F17-56471-Q**

## MEMORANDUM OPINION

Before Justices Bridges, Partida-Kipness, and Carlyle
Opinion by Justice Partida-Kipness

Appellant, Robert Nash, appeals his convictions for assault family violence by impeding breath or circulation and violation of a protective order.[1] Nash entered an open plea of guilty to the trial court in each case. The trial court found Nash guilty of both offenses and assessed punishment at eight years' imprisonment in the assault case and 365 days' confinement in the county jail in the protective order case. On appeal, Nash contends that the sentences in both cases violate his constitutional rights under the United States and Texas Constitutions because they are grossly disproportionate to the offense and inappropriate to the offender. We affirm the trial court's judgments.

---

[1] In the protective order case, Nash was originally indicted for the third-degree felony offense of violation of a protective order two times or more within twelve months. The trial court granted the State's motion to reduce the offense to the Class A misdemeanor offense of violation of a protective order.

**BACKGROUND**

Nash pleaded guilty to assaulting Nicole Goulding on July 5, 2017, as alleged in the indictment.[2] During the punishment hearing, Goulding testified she met Nash while working at the Dallas VA Medical Center and they began dating. The relationship turned bad after four or five months. Nash was jealous and manipulative and began to verbally and mentally abuse Goulding by threatening her and accusing her of cheating on him if she looked at or interacted with other men. In addition to the verbal and mental abuse Nash regularly inflicted upon Goulding, Nash began physically abusing her. Goulding described an incident which occurred about a month before the charged assault. On June 5, 2017, it was late in the evening and Goulding was at the sink in her bathroom when Nash came in, grabbed her by the neck and slammed her head into the wall. When her brother came into the bathroom to check on her, Nash tried to attack him and threatened to kill him if he called 911.

The next incident occurred on July 5. On that day, Goulding was at work and had her yearly scheduled MRI surveillance scans.[3] Because she had to be sedated during the MRI's, she arranged for Nash to drive her home. When Nash arrived to pick her up, he saw Goulding talking with one of the maintenance workers and after she got in the car, began yelling at her. Instead of taking Goulding home, he drove her around for hours, drinking beer and verbally abusing her. After he pulled up to the side of the house, he continued yelling at Goulding and started punching her in the face and nose with his fist. Blood spewed everywhere and Goulding began screaming. Nash then grabbed her, pulled her towards him, and put his arm around her neck in a chokehold

---

[2] The indictment alleged that Nash assaulted Goulding "BY GRABBING AND BY SQUEEZING COMPLAINANT WITH A HAND AND HANDS AND AN ARM AND ARMS AND BY STRIKING COMPLAINANT WITH A HAND, . . . and further, the Defendant committed the said offense by . . . impeding the Complainant's normal breathing and circulation of blood by applying pressure to the Complainant's throat and neck and by blocking the Complainant's nose and mouth."

[3] Before working at the VA Medical Center, Goulding was in the army and was injured during a combat deployment. After a lengthy surgery, she suffered two pulmonary embolisms and was diagnosed with a form of lupus and MS. The MS requires yearly surveillance scans of her spinal cord and brain.

position until she was unable to breathe. Goulding fought with him and when he let up, she jumped out of the car and started screaming "call 911, he's trying to kill me" as she ran towards the front door of her house. Nash ran after her and knocked her down onto the cement sidewalk where she hit her head and lost consciousness. When she regained consciousness, Nash was kicking her with his boots and trying to grab her neck. Nash continued hitting and kicking her and grabbing her neck as Goulding tried to escape. Nash ran away after neighbors yelled that police were on the way, and two men and her brother approached to intervene. Five minutes later, Nash returned to the house, pounding his fists on the back door. The police were present and arrested him.

An emergency protective order was issued that night. Nevertheless, Nash called Goulding and threatened to kill her, her brother, and her dogs, if she did not bond him out of jail. As soon as Nash was released, he contacted Goulding, claiming he had no memory of the assault due to his drinking; he blamed her for his actions. Nash refused Goulding's offer to take him to the VA medical center for help.

During the following week, Nash and Goulding smoked marijuana together. On the evening of July 13, Nash came to her house and while there, drank heavily. He threatened to kill Goulding if she ever looked at another man. Later in the evening, he came into her bedroom and sexually assaulted her. Nash eventually passed out but Goulding did not leave to seek help because she did not want her brother or her dogs to get hurt. She had a VA appointment the next day and told her doctor that Nash had sexually assaulted her. The police were notified and when Nash returned to pick Goulding up from her appointment, he was taken into custody.

Following Nash's arrest on July 14, Goulding obtained a two-year protective order prohibiting contact. Despite the protective order, Nash called Goulding from jail more than sixty times between his arrest and the punishment hearing and also recruited his friends to call her. When a detective blocked some of those numbers from calling her, Nash enlisted his aunt and

brother to call her. Nash also wrote Goulding letters while he was in jail and attempted to disguise his identity. In his letters, he asked her to sign an affidavit of non-prosecution.

As a result of Nash's assault, Goulding suffered a broken nose, two black eyes, two bumps on her head, four chipped teeth, four cracked teeth, scratches and bruises covering her arms and legs, cuts on her feet, and bruises on her breasts and rib. She also suffered a petechial hemorrhage in one of her eyes caused by being choked. Goulding testified she was afraid of Nash and feared that he would hurt her and her brother. Goulding did not think that Nash would stop contacting her if he was sentenced to probation, stating "that would basically sign my death warrant."

Nash testified on his own behalf recounting his version of the events leading to the assault. Nash testified he blacked out from his alcohol use during the drive home from the VA and after police arrested him, awoke in jail with no knowledge as to how he got there. Nash testified that Goulding arranged for his release from jail without any threat of harm by him and that he never sexually assaulted her or threatened to kill her or her brother. According to Nash, he would never have assaulted Goulding if he were not intoxicated. Nash admitted that he was previously convicted for assaulting two former girlfriends and had numerous other convictions which were the result of his crack cocaine addiction and alcohol abuse.[4] Nash, and numerous other witnesses, also testified about Nash's childhood in foster care, the death of his mother, his military service, his religious beliefs and faith, his work at the VA medical center, his love for his daughter, and his issues stemming from drug and alcohol abuse. Nash asked the court to sentence him to probation with terms and conditions that would allow him to obtain treatment for his alcohol abuse and domestic violence issues.

---

[4] The State's Notice of Extraneous Offenses indicates that during the years 2006 through 2015, Nash also had more than twenty convictions for criminal trespass, and convictions for fictitious counterfeit inspection/insurance document for display; criminal mischief; possession of a controlled substance; possession of marijuana; evading arrest/detention; manufacture/delivery of a controlled substance; evading arrest with previous conviction.

# ANALYSIS

In two issues, Nash contends that the sentences in both cases violate his constitutional rights under the United States and Texas Constitutions because they are grossly disproportionate to the offense and inappropriate to the offender. The State argues Nash failed to preserve error. Alternatively, the State argues the sentences are not excessive or unconstitutionally cruel and/or unusual; nor are they disproportionate to the offense or the offender. We agree with the State.

A defendant must make a timely objection or motion in the trial court to preserve alleged error relating to excessive or cruel or unusual punishment. TEX. R. APP. P. 33.1(a)(1); *Casteneda v. State*, 135 S.W.3d 719, 723 (Tex. App.—Dallas 2003, no pet.); *Fife v. State*, No. 05-16-00094-CR, 2017 WL 2351083, at *3 (Tex. App.—Dallas May 31, 2017, pet. ref'd) (mem. op., not designated for publication). Nash did not complain about the sentences either at the time they were imposed or in his motions for new trial. As a result, Nash has not preserved the issue for our review.

Even if appellant had properly preserved the issue for our review, we conclude the sentences are not grossly disproportionate. Using nearly identical language, both the United States and Texas Constitutions prohibit cruel and/or unusual punishment, with one variation; the Texas constitution states its prohibition disjunctively—"cruel or unusual" while the federal constitution states is prohibition conjunctively—"cruel and unusual." *Cf.* U.S. CONST. amend. VIII, *with* TEX. CONST. art. I, § 13. However, there is no significant difference in the protections afforded by either constitutional protection. *Cantu v. State*, 939 S.W.2d 627, 645 (Tex. Crim. App. 1997); *Reyes v. State*, 557 S.W.3d 624, 631 (Tex. App.—El Paso 2017, pet. ref'd); *Duran v. State*, 363 S.W.3d 719, 723 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

Texas courts rarely consider a punishment that is within the statutory range for the offense established by the Legislature to be excessive or unconstitutionally cruel or unusual under either

the Texas Constitution or the United States Constitution. *Ex parte Chavez*, 213 S.W.3d 320, 323 (Tex. Crim. App. 2006) (quoting *Miller-El v. State,* 782 S.W.2d 892, 895–96 (Tex. Crim. App. 1990) (describing the trial court's discretion to impose any punishment within the prescribed range as being essentially unfettered)); *see also Foster v. State*, 525 S.W.3d 898, 911 (Tex. App.—Dallas 2017, pet. ref'd) (general rule is as long as sentence is within proper range of punishment, it will not be disturbed on appeal); *Ajisebutu v. State*, 236 S.W.3d 309, 314 (Tex. App.—Houston [1st. Dist.] 2007, pet. ref'd) (same). Assault family violence by impeding breath or circulation is a third degree felony and the range of punishment is two to ten years' confinement in TDCJ. TEX. PENAL CODE §§ 12.34(a), 22.01(b)(2)(B). The violation of protective order charged in this case is a Class A misdemeanor and the range of punishment is confinement in jail for a term not to exceed one year. *See* TEX. PENAL CODE §§ 12.21(2), 25.07(g). Nash's eight year sentence in the assault case and 365 day sentence in the protective order case falls within the statutory range for the charged offenses, and as such, is presumptively neither cruel nor unusual.

An assessed punishment within the statutory range, however, must still be proportionate to the underlying offense. The concept of proportionality is embodied in the Eighth Amendment to the United States Constitution's ban on cruel and unusual punishment and requires that punishment be graduated and proportioned to the offense. U.S. CONST. amend. VIII. But this is a narrow principle that does not require strict proportionality between the crime and the sentence. *State v. Simpson*, 488 S.W.3d 318, 323 (Tex. Crim. App. 2016) (citing *Harmelin v. Michigan*, 501 U.S. 957 (1991) (Kennedy, J., concurring)); *Foster*, 525 S.W.3d at 910. Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime. *Id*. A sentence is grossly disproportionate to the crime "only in the exceedingly rare or extreme case." *Id*.

To determine whether a sentence for a term of years is grossly disproportionate for a particular defendant's crime, we judge the severity of the sentence in light of the harm caused or

threatened to the victim, the culpability of the offender, and the offender's prior adjudicated and unadjudicated offenses. *Id*. In the rare case in which this threshold comparison leads to an inference of gross disproportionality, we then compare the defendant's sentence with the sentences of other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. *Id*. If this comparative analysis validates an initial judgment that the sentence is grossly disproportionate, the sentence is cruel and unusual. *Id*.

The record reflects that Nash pleaded guilty to intentional, knowingly, and recklessly causing bodily injury to Goulding, a woman with whom he had a dating relationship. The facts presented to the trial court demonstrate that the harm caused to Goulding was significant. The assault was brutal. After picking her up from her appointment, Nash kept her trapped in the car, and verbally abused her while he drove around for hours drinking beer. When he finally pulled up to the house, he started punching her in the face and nose with his fist, breaking her nose and causing severe bleeding. He then choked her so severely that she was unable to breathe and suffered a petechial hemorrhage in one of her eyes. After she was finally able to get out of his grip and escape the car to try to get into the house, Nash ran after her and knocked her down on the cement sidewalk causing her to lose consciousness. Nash continued kicking her and grabbing her neck even as she regained consciousness and tried to escape. He only stopped his attack when he learned that the police had been called and three other men appeared to be coming to Goulding's aid. Even after he was arrested, Nash contacted Goulding and threatened to kill her, her brother and her dogs if she did not bond him out of jail. After being released, he violated the emergency protective order by coming to Goulding's house where he sexually assaulted her after spending the evening there drinking heavily and smoking marijuana. After he was arrested for those crimes, and was confined in jail, Nash continuously violated the two-year protective order obtained by Goulding by placing dozens of calls to Goulding and writing her numerous letters. When steps

were taken to block the calls and letters, Nash recruited friends and relatives to call and harass Goulding and continued to send her letters by attempting to disguise his identity.

In addition to the brutal nature of the assault on Goulding, and Nash's continued defiance of the protective orders even after being confined, the record shows this was not the first time Nash assaulted someone whom he was dating. Nash admitted to two prior convictions for assaulting two former girlfriends. The record also showed, and Nash acknowledged, a lengthy criminal history consisting of no less than thirty-one prior convictions in addition to the two prior assault convictions.

Having reviewed the record, we cannot say that this is one of those "rare" cases that leads to the inference that Nash's sentences were grossly disproportionate to the offenses. As such there is no need to compare his sentences to sentences imposed on others. *Simpson*, 488 S.W.3d at 323. We overrule Nash's first and second issues.

## CONCLUSION

We affirm the trial court's judgment.

/Robbie Partida-Kipness/
ROBBIE PARTIDA-KIPNESS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
180583F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ROBERT EARL NASH, Appellant

No. 05-18-00583-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 204th Judicial District Court, Dallas County, Texas
Trial Court Cause No. F17-41188-Q.
Opinion delivered by Justice Partida-Kipness, Justices Bridges and Carlyle participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 17th day of April, 2019.



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

ROBERT EARL NASH, Appellant

No. 05-18-00584-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 204th Judicial District Court, Dallas County, Texas
Trial Court Cause No. F17-56471-Q.
Opinion delivered by Justice Partida-Kipness, Justices Bridges and Carlyle participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 17th day of April, 2019.